PRESENT:  All the Justices

B. ALAN GLOSS, ET AL.

v.  Record No. 210779

ANN B. WHEELER, ET AL.

OPINION BY
JUSTICE WESLEY G. RUSSELL, JR.
MAY 18, 2023

FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
Dennis J. Smith, Judge Designate

B. Alan Gloss and Carol Fox ("plaintiffs"), residents of Prince William County, filed a "Petition for Mandamus and Injunction" in the Circuit Court of Prince William County alleging that Ann B. Wheeler, Andrea O. Bailey, Kenny Boddye, Victor S. Angry, and Margaret Angela Franklin ("defendants"), five members of the Prince William County Board of Supervisors, knowingly and willfully violated the Virginia Freedom of Information Act ("VFOIA") by attending a meeting as defined by VFOIA without complying with statutory requirements.  At the trial of this matter, the circuit court granted the defendants' motion to strike made at the conclusion of plaintiffs' evidence, concluding that the gathering at issue did not constitute a meeting under VFOIA.  On appeal, plaintiffs contend the circuit court erred by doing so.  For the reasons that follow, we conclude that the circuit court erred in granting the motion to strike.  Accordingly, we reverse the judgment of the circuit court and remand the matter for further proceedings consistent with this opinion.

## I. BACKGROUND[1]

On May 25, 2020, George Floyd was killed while in the custody of police officers in Minneapolis, Minnesota. Over the next few days, video showing Floyd's arrest, detention, and ultimate death spread, spawning nationwide protests about the conduct of the officers involved, Floyd's death, and larger social issues generally.

One such protest occurred in Prince William County on May 30, 2020. The case underlying this appeal stems from the events of that night and the acts and omissions of certain Prince William County officials in the aftermath of those events. Resolution of the appeal requires an understanding of the powers, duties, and responsibilities of the Prince William County Board of Supervisors ("Board"), the events of May 30, 2020, and the actions taken by public officials afterwards.

### A. Powers, duties, and responsibilities of the Board

Prince William County utilizes the county executive form of government. *See* Code § 15.2-500 *et seq.* Accordingly, all "powers of the county as a body politic and corporate [are] vested in [the] [B]oard[.]" Code § 15.2-502(A). At all times relevant, the Board had eight members.[2]

---

[1] "When reviewing a trial court's decision to grant a motion to strike the plaintiff's evidence, we view the evidence presented at trial in the light most favorable to the plaintiff and accord the plaintiff the benefit of any inferences that may be fairly drawn from the evidence." *Curtis v. Highfill*, 298 Va. 499, 502-03 (2020). Furthermore, "the non-moving party 'must be given the benefit of all substantial conflict in the evidence, and all fair inferences that may be drawn therefrom.'" *Dill v. Kroger Ltd. P'ship I*, 300 Va. 99, 109 (2021) (quoting *Egan v. Butler*, 290 Va. 62, 73 (2015)). Accordingly, we recite the facts consistent with this view of the evidence, omitting reference to evidence that conflicts with such a view.

[2] The members of the Board were the defendants along with Supervisors Pete Candland, Jeanine Lawson, and Yesli Vega. Supervisors Candland, Lawson, and Vega were not given notice of the gathering that is at issue in this case and none of them were in attendance.

The Board is "the policy-determining body of the county and . . . vested with all rights and powers conferred on boards of supervisors by general law[.]" Code § 15.2-504. These powers include the power to investigate county officers by "inquir[ing] into the official conduct of any office or officer under its control," Code § 15.2-506, and "provid[ing] for the performance of all the governmental functions of the county" by "provid[ing] for and set[ting] up all necessary departments of government[.]" Code § 15.2-507.

To assist it in the exercise of these and other powers it possesses, the Board is required to "appoint a county executive[.]" Code § 15.2-509. Such county executive is "not . . . appointed for a definite tenure," but rather, serves "at the pleasure of the [B]oard." Code § 15.2-510. Among other duties, the county executive is "responsible to the [B]oard for the proper administration of the affairs of the county which the [B]oard has authority to control[,]" Code § 15.2-516, and is part of the process by which the Board adopts a budget for the county and its various departments. Code § 15.2-539.

The county executive is charged with assisting the Board in selecting county officers and employees, but the ultimate authority over such matters resides with the Board. Specifically, Code § 15.2-512 provides that "[t]he [B]oard shall appoint, upon the recommendation of the county executive, all officers and employees in the administrative service of the county[.]" "Any officer or employee of the county appointed pursuant to § 15.2-512 may be suspended or removed from office or employment . . . by the [B]oard[.]" Code § 15.2-513.

Although it may create additional departments, the Board is required by statute to create certain, specified departments, including a "[d]epartment of law enforcement." Code §§ 15.2-507 & 15.2-518(3). "The department of law enforcement shall consist of such police as may be appointed pursuant to § 15.2-512, and police officers appointed by the [B]oard, pursuant

3

to such section, including the chief of the department." Code § 15.2-528. Although, as with all county departments, the department of law enforcement ultimately is subject to Board control, "[t]he county executive shall have supervision and control of the county police force." *Id.* Like all other department heads, the head of the department of law enforcement "shall be entitled to present [his or her] views on matters relating to [the] department[]" to the Board. Code § 15.2-512.

## B. Events of Saturday, May 30, 2020

On May 30, 2020, a protest related to George Floyd's killing took place in Prince William County. The protest, which began peacefully, turned violent. An unlawful assembly was declared around 8:00 p.m.; however, the protestors did not disband, and the group continued to grow. The situation escalated with acts of vandalism and violence, and eventually the events were characterized by county officials as "riots." The riots were not county-wide and primarily occurred in the Manassas and Gainesville sections of the county, areas represented on the Board by Supervisors Candland and Lawson.

The riots were significant enough that, shortly after 10:00 p.m., police officials sent an email to all members of the Board to provide some information regarding the events. In that email, each member of the Board was informed that, at that time, police were "still attempting to regain order" and that portions of "Sudley Rd remain[ed] closed" because of the ongoing riots. The Board members also were informed that "[a]n alert" had been sent to residents of the affected areas and that the police department would continue to post updates on its social media platforms. Eventually, the Virginia State Police dispersed the riot, allegedly using chemical agents to control the crowd.

4

Because the initial demonstrations were, in part, about the police misconduct related to George Floyd and policing generally, and the fact the riots that developed in the county had caused conflict between protestors and police, tensions were high. County officials, including police, Board members, and the county executive, as well as community leaders all recognized the potential for further problems and a need to address that possibility. As a result, multiple gatherings were scheduled for the next day to collect information about the riots, the police response to those riots, and the steps to be taken going forward by various county officials and others.

Three such gatherings are central to this appeal. At 12:30 p.m., Board-chairman Wheeler met with police officials to discuss the situation. At 1:00 that afternoon, five members of the Board attended a gathering arranged by police officials and members of the police Citizens' Advisory Board that also was attended by more than sixty members of the community. Finally, at 4:00 that afternoon, all eight members of the Board attended a properly noticed, emergency public meeting of the Board. Given the compressed time frame, communication about and the scheduling of some of these gatherings was occurring while another of the gatherings was ongoing. As a result, the timeline for each involves some degree of overlap. For clarity's sake, we address each of the three gatherings separately below.

### C. Sunday, May 31, 2020 gatherings

#### 1. Chairman Wheeler meets with police officials

Shortly after midnight on May 31, 2020, Chairman Wheeler had sufficient information about the May 30, 2020 riots and the potential for further problems to believe she needed to take some action. At 12:06 a.m., Chairman Wheeler sent a text message to the county executive requesting to meet with police officials. At trial, she testified that she sought to meet with police

to learn "what happened that evening that was going on with the demonstrations in Manassas" and agreed that that information and any responses to it were "*part of the county's business*[.]" (Emphasis added.)

The county executive responded by text at 8:40 a.m. that he had arranged for Chairman Wheeler to meet with police at 12:30 at the Central District police station. In that text message, the county executive also informed Chairman Wheeler that Police "Chief Barnard has also scheduled a 1:00 meeting with a few community leaders which I believe you should be at." Chairman Wheeler responded to the text, writing "Yes[,] that would [be] fine. I would like to talk before hand with a few quick questions."

Chairman Wheeler met with the chief of police and the deputy chief of police at 12:30 that afternoon. She confirmed with police officials that chemical agents had been used to disperse the riots. She expressed her opinion to the police officials that "we could do better and that the Virginia State Police the night before, you know, seemed a little aggressive." At the conclusion of her discussions with police officials, Chairman Wheeler walked directly to the 1:00 gathering.

### 2. 1:00 p.m. gathering

While Chairman Wheeler was attempting to set up her meeting with police officials, others were busy organizing another gathering to discuss the riots. Specifically, Prince William County Police Chief Barry Barnard "coordinated and orchestrated" a gathering at police headquarters to be held on May 31, 2020, at 1:00 p.m. Chief Barnard, Deputy Chief Jarad Phelps, and Reverend Cozy Bailey,[3] who then served as Chair of the police department's Citizens' Advisory Board and also as the head of the local NAACP Chapter, were involved in

---

[3] Reverend Bailey is the husband of Supervisor Bailey, one of the defendants.

6

organizing the gathering. Given the county executive's text message to Chairman Wheeler at 8:40 a.m. on May 31, 2020, the time and place of the meeting were known to the organizers and others as early as 8:40 that morning.

Although there was conflicting testimony at trial, multiple members of the Board adopted the characterization of the 1:00 gathering as a police Citizens' Advisory Board meeting. Prior to trial, Deputy Chief Phelps characterized it in a Board meeting as a Citizens' Advisory Board meeting. Furthermore, in a statement made at a June 2, 2020 formal meeting of the Board that was introduced in evidence, Supervisor Bailey identified the gathering as a Citizen's Advisory Board meeting. The two police chiefs and Reverend Bailey ran the meeting. Thus, viewed in the light most favorable to the plaintiffs, the meeting was a meeting of Prince William County's police Citizens' Advisory Board. Accordingly, we will refer to it as the "CAB meeting."

Invitations to the CAB meeting were extended by members of the police staff and by word of mouth from various participants, including members of the Board who were aware of the CAB meeting.[4] Approximately sixty people attended the CAB meeting. Along with police and "community leaders," attendees included the five defendant members of the Board: Chairman Wheeler and Supervisors Angry, Bailey, Boddye, and Franklin.

Despite attending and being aware of the meeting, the defendants did not invite the remaining three members of the Board to the CAB meeting. Similarly, police officials did not invite the three other members of the Board to the CAB meeting. Eventually, Deputy Chief

---

[4] Supervisor Bailey testified that she made Supervisor Franklin aware of the CAB meeting. Despite Supervisor Bailey's testimony that she only learned of the CAB meeting on the morning of May 31, 2020, Supervisor Franklin testified that Supervisor Bailey informed her about the CAB meeting on May 30, 2020. Supervisor Franklin testified that she, in turn, informed Supervisor Boddye of the CAB meeting.

Phelps offered a public apology at a formal Board meeting for the failure to invite at least Supervisor Lawson to the CAB meeting.

When Chairman Wheeler arrived at the CAB meeting, she "felt [she] should sit near the front, because [she] was the chair of the county." She moved the chair in which she chose to sit, "pull[ing] it in front of the front row[.]" She testified that she attended the meeting and sat where she sat because she was there to "represent the [B]oard." During the course of the meeting, the meeting organizers identified her to the audience as Board Chairman and gave her an opportunity to address the audience as a result. She did so.

The CAB meeting began with a presentation from police officials regarding the events of the previous night. The riots, the use of force by police, the use of chemical agents to quell the riots, and the property damage that was caused all were discussed. The discussion also included an explanation of "how the Virginia State Police were called in [and] about how it was turned over to the Virginia State Police."

Some of the defendants participated in the discussions. Of particular note, according to Supervisor Franklin, Supervisor Boddye made a specific request of the police chief to include certain items in an after-action report.[5] After making the request, Supervisor Boddye inquired of the police chief when the report would be available.

---

[5] Defendants, pointing to Supervisor Boddye's testimony, argue that he never made such a request. Because Supervisor Franklin's testimony that such a request was made is more favorable to plaintiffs, the circuit court was required to credit her testimony and reject Supervisor Boddye's testimony on this point in deciding the motion to strike. Similarly, we are required to credit Supervisor Franklin's testimony regarding this issue in resolving this appeal. *Dill*, 300 Va. at 109.

The CAB meeting lasted for several hours. While the CAB meeting was in progress, the Board members in attendance had to leave the CAB meeting so that they could attend the emergency Board meeting that had been scheduled and formally noticed for 4:00 that afternoon.

3. Emergency meeting of the Board of Supervisors at 4:00 p.m.

Before the CAB meeting started, Supervisor Vega sent an email addressed to the county executive and Chairman Wheeler requesting an emergency meeting of the Board due to "the events that transpired last night, and the ones potentially to follow[.]" All of the members of the Board as well as the county attorney were copied on the email, which was sent at 12:08 p.m. In the email, Supervisor Vega stated that it was "imperative that all board members are kept informed so that we can help restore peace and order."

Within five minutes of Supervisor Vega's email, Supervisor Candland responded by email. In his email, which he sent to all Board members, the county executive, and the county attorney, Supervisor Candland "second[ed]" Supervisor Vega's request for an emergency meeting and noted that he had been hearing "rumors" of further disturbances to come, had been receiving calls from concerned constituents, and stated his position that it was "critical [that] we hear an update on how these events will be handled."

Less than ten minutes later, at 12:21 p.m., Supervisor Lawson sent an email to all the members of the Board, the county executive, and the county attorney. In her email, she "concur[red]" in the request for an emergency meeting of the Board and stated that she had "several property owners on edge[.]"

At 12:30 p.m., Supervisor Bailey responded regarding the request for an emergency meeting by sending an email to all of the Board members, the county executive, and the county attorney. In the email, she enthusiastically endorsed the need for an emergency meeting of the

9

Board, writing that such a meeting was "necessary!" She opined that "[t]here needs to be an emergency meeting and press conference collective with 'all' board members for the community held immediately." She continued by opining that "[o]ur procrastination is not serving." She ended her email by stating that she would "be in a community meeting with the NAACP starting at 1pm[,]" and thus, would be "available to meet at 3 or 4pm."

From the evidence, it is clear that the "NAACP meeting" referenced in Supervisor Bailey's email was the 1:00 CAB meeting referenced above. Despite having invited at least one other Board member to the CAB meeting, Supervisor Bailey did not use the email to invite Supervisors Candland, Lawson, or Vega to what Supervisor Bailey has characterized as a CAB meeting. She did not inform them that county employees would be present at the meeting and did not, at any point before the 4:00 meeting of the Board, inform them that more than three members of the Board attended the CAB meeting.

At 1:08 p.m., while attending the CAB meeting, Chairman Wheeler responded with an email to the members of the Board, the county executive, and the county attorney regarding the request for an emergency meeting. She indicated that she presently was "in a meeting with police and community leaders" but had "instructed" the county executive "to arrange a board meeting for 4 pm if possible." She noted that she was "consulting the county attorney with regard to notice" requirements of VFOIA for such a meeting, but believed those requirements could be met "because of [the] emergency conditions[.]"

From the evidence, it is clear that the "meeting with police and community leaders" referenced in Chairman Wheeler's email was the 1:00 CAB meeting referenced above, and thus, was the same meeting that Supervisor Bailey had referenced in her 12:30 p.m. email to the group. Chairman Wheeler did not indicate that the meeting she referenced was the same meeting

10

as the one referenced by Supervisor Bailey or that five members of the Board were present at the meeting.

Three minutes later, at 1:11 p.m., Supervisor Bailey responded to Chairman Wheeler's email. The email was sent to all of the members of the Board, the county executive, and the county attorney. The email thanked Chairman Wheeler for her leadership; but again, it did not inform the recipients that Supervisor Bailey, Chairman Wheeler, and three other members of the Board were, at that time, in the CAB meeting. It also did not suggest that the "meeting with police and community leaders" referenced in Chairman Wheeler's email was the same meeting that Supervisor Bailey had referenced in her 12:30 p.m. email to the group.

The county executive responded with an email to the members of the Board, the county attorney, and other county staff at 1:24 p.m. He indicated that an emergency Board meeting would take place "at 4:00 PM in the [B]oard chambers in the McCoart Bldg." and instructed county staff to take certain steps. Apparently recognizing that VFOIA's requirements applied to the meeting, he instructed county staff to review the "rules of procedure and schedule an emergency meeting[.]" He indicated that there was a "need to advertise this meeting as soon as possible." Furthermore, regarding the Board meeting, he informed the recipients of the email that "the topic of discussion will be, and can only be, the demonstrations that are occurring in PWC in response to the events in MN and what we can do to allow, and help ensure, the demonstrations occur safely and peacefully." He concluded the email by inquiring of the county attorney if he had "missed anything with regard to scheduling the emergency meeting."

At 1:49 p.m., Supervisor Candland sent an email to thank Chairman Wheeler for setting up the meeting. In the email, which was sent to the members of the Board, the county executive, and the county attorney, Supervisor Candland expressed his appreciation for Chairman

11

Wheeler's efforts, thanking her for "listening to us in supporting Supervisor Vega's call for an emergency meeting." He concluded by noting that he would "[s]ee you at 4:00pm."

County staff emailed formal notice of the emergency Board meeting to members of the Board at 2:54 p.m. In addition to identifying the time and place of the meeting, the notice indicated that the meeting agenda was limited to "[d]iscussion of the demonstrations occurring in Prince William County in response to events in Minnesota and what measures can be taken to ensure that demonstrations occur safely and peacefully."

The members of the Board convened for the 4:00 meeting. Consistent with the agenda provided for in the notice, issues related to the riots, the use of force by police, the use of chemical agents to quell the riots, and the property damage that was caused were discussed. Multiple members of the Board who attended both the CAB meeting and the emergency Board meeting confirmed that the same topics were discussed at the two meetings. Supervisor Bailey testified that the police chief gave the same presentation at the 4:00 Board meeting that had been given at the 1:00 CAB meeting.

In addition to covering these topics, the 4:00 Board meeting involved a discussion of the 1:00 CAB meeting and why three members of the Board had not been given notice of or otherwise invited to the CAB meeting. There also was discussion of whether, given the presence and involvement of a majority of the Board, the CAB meeting had been held in violation of VFOIA's open meeting requirements.

D. Proceedings in the circuit court and the ruling on the motion to strike

Echoing the VFOIA concerns raised at the 4:00 emergency meeting of the Board, plaintiffs filed suit, alleging that the CAB meeting violated the open meeting requirements of VFOIA. Among other things, plaintiffs sought a finding that defendants had "knowingly and

12

willfully" violated VFOIA, a mandate and injunction requiring defendants to comply with VFOIA going forward, and recovery of the plaintiffs' costs and attorney fees.

The trial was held on October 7, 2020. In their case, plaintiffs called all five of the Board members who attended the CAB meeting. In addition to testimony, the parties introduced documentary evidence, including text messages and emails related to the various meetings. Finally, plaintiffs introduced portions of video recordings of the 4:00 emergency Board meeting and a subsequent meeting of the Board where the May 31, 2020 meetings were discussed.

At the conclusion of plaintiffs' evidence, defendants moved to strike. Their primary contention was that the CAB meeting did not fall within VFOIA's definition of "meeting," and therefore, VFOIA did not apply to the CAB meeting.

Agreeing with defendants, the circuit court granted the motion to strike from the bench. Prior to the circuit court entering an order memorializing its ruling, plaintiffs filed a motion for reconsideration. The circuit court held a hearing on the motion on January 8, 2021. On May 18, 2021, the circuit court entered an order memorializing its granting of the motion to strike and denying the motion for reconsideration. In that order, the circuit court noted that its ruling was based "on the [c]ourt's finding that the evidence presented was insufficient as a matter of law to establish that the [CAB] meeting . . . was a meeting subject to the provisions of the Virginia Freedom of Information Act as alleged[.]" As a result, the circuit court concluded that defendants were "not liable for any alleged violations of [VFOIA] as pleaded or argued[,]" and thus, were entitled to judgment. Asserting that the circuit court erred in granting the motion to strike, plaintiffs petitioned to this Court, and we granted review.

13

## II. ANALYSIS

### A. Standard of review

In granting a motion to strike, a "circuit court must not judge the weight or credibility of evidence[.]" *Dill v. Kroger Ltd. P'ship I*, 300 Va. 99, 109 (2021). Rather, a circuit court must "accept as true all the evidence favorable to the plaintiff" and grant to the plaintiff "any reasonable inference" that may be drawn from such a view of the evidence. *Austin v. Shoney's, Inc.*, 254 Va. 134, 138 (1997). A circuit court may grant a motion to strike at the conclusion of a plaintiff's evidence "only where 'it is conclusively apparent that plaintiff has proven no cause of action[.]'" *Int'l Paper Co. v. Cnty. of Isle of Wight*, 299 Va. 150, 170 (2020) (quoting *Brown v. Koulizakis*, 229 Va. 524, 531 (1985)). Accordingly, "[w]hen reviewing a trial court's decision to grant a motion to strike the plaintiff's evidence, we view the evidence presented at trial in the light most favorable to the plaintiff and accord the plaintiff the benefit of any inferences that may be fairly drawn from the evidence." *Curtis v. Highfill*, 298 Va. 499, 502-03 (2020). To the extent our review of the circuit court's judgment requires us to engage in statutory interpretation, it presents questions of law subject to de novo review. *Transparent GMU v. George Mason Univ.*, 298 Va. 222, 237 (2019).

### B. Purpose and construction of VFOIA

Currently codified at Code § 2.2-3700 *et seq.*,[6] "VFOIA has existed, in one form or another, since 1968." *Am. Tradition Inst. v. Rector & Visitors of Univ. of Virginia*, 287 Va. 330, 339 (2014). In adopting VFOIA, the General Assembly included an express statement of the purpose of the statutory scheme. Specifically, the General Assembly adopted VFOIA to

---

[6] Plaintiffs initiated their suit in 2020. The General Assembly amended Code § 2.2-3700 *et seq.* in 2022. *See* 2022 Acts chs. 325, 597 (Reg. Sess.). These amendments have no bearing on this case.

14

"ensure[] the people of the Commonwealth ready access to public records in the custody of a public body or its officers and employees, and free entry to meetings of public bodies wherein the business of the people is being conducted." Code § 2.2-3700(B). VFOIA guarantees such access because "[t]he affairs of government are not intended to be conducted in an atmosphere of secrecy since at all times the public is to be the beneficiary of any action taken at any level of government." *Id.* Absent proper invocation of a statutory exception, "every meeting shall be open to the public" and "[a]ll public records and meetings shall be presumed open[.]" *Id.*

To help effectuate these purposes, the General Assembly adopted a special rule of construction for interpreting VFOIA. Specifically, VFOIA "shall be liberally construed to promote an increased awareness by all persons of governmental activities and afford every opportunity to citizens to witness the operations of government" and "[a]ny exemption from public access to records or meetings shall be narrowly construed and no record shall be withheld or meeting closed to the public unless specifically made exempt pursuant to this chapter or other specific provision of law." *Id.* We previously have recognized that this VFOIA-specific rule of construction "puts the interpretative thumb on the scale in favor of" open government. *Fitzgerald v. Loudoun Cnty. Sheriff's Off.*, 289 Va. 499, 505 (2015).

### C. Meetings of public bodies under VFOIA

To further its purpose, VFOIA requires that "[a]ll meetings of public bodies shall be open[,]" Code § 2.2-3707(A), raising the questions of what constitutes both a "public body" and a "meeting." VFOIA's definitions section provides the answers.

Code § 2.2-3701 defines "public body" to encompass, among other things, "governing bodies of counties[,]" making such governing bodies subject to the open meeting provisions of VFOIA. In turn, VFOIA defines "meeting" to include

15

> work sessions . . . as a body or entity, or as an informal assemblage of (i) as many as three members or (ii) a quorum, if less than three, of the constituent membership, wherever held, with or without minutes being taken, whether or not votes are cast, of any public body.

*Id.* Having defined "meeting" in broad terms, VFOIA then creates exceptions to that definition. Specifically,

> [n]either the gathering of employees of a public body nor the gathering or attendance of two or more members of a public body (a) at any place or function where no part of the purpose of such gathering or attendance is the discussion or transaction of any public business, and such gathering or attendance was not called or prearranged with any purpose of discussing or transacting any business of the public body, or (b) at a public forum, candidate appearance, or debate, the purpose of which is to inform the electorate and not to transact public business or to hold discussions relating to the transaction of public business, even though the performance of the members individually or collectively in the conduct of public business may be a topic of discussion or debate at such public meeting, shall be deemed a "meeting" subject to the provisions of this chapter.

*Id.*

If a gathering falls within VFOIA's definition of a "meeting[,]" it is then subject to the open meeting requirements of Code § 2.2-3707. Among other things, the statute requires that public meetings be publicly noticed, Code § 2.2-3707(C)-(D), that any public body having a meeting provide the public with the agenda and related materials, Code § 2.2-3707(F), and that written minutes of the meeting be taken. Code § 2.2-3707(H).

Here and in the proceedings below, plaintiffs contend that the CAB meeting was a "meeting" of a "public body" as those terms are defined in Code § 2.2-3701 and that the open meeting requirements set forth in Code § 2.2-3707 applied. Defendants did not and do not contest that the Board constitutes a "public body" within the meaning of VFOIA or that the CAB meeting did not comply with the open meeting requirements of Code § 2.2-3707. Rather,

16

defendants contend that the evidence was insufficient to allow a rational factfinder to conclude that the CAB meeting was a "meeting" as defined in Code § 2.2-3701.

### D. CAB meeting as a meeting under VFOIA

As noted above, there is no dispute that the Board is a public body as defined in VFOIA and that both it and its members are subject to the open meeting requirements of VFOIA. Furthermore, it is undisputed that more than three members of the Board attended the CAB meeting, that the CAB meeting also was attended by community leaders and county employees, and that the events of May 30, 2020, and the county's response to those events were what was intended to be and what was, in fact, discussed at the CAB meeting. As such, unless the CAB meeting falls within one of the two exceptions contained in the definition of "meeting" found in Code § 2.2-3701, it was a meeting for the purpose of VFOIA's open meeting provisions. Viewing the evidence in the light most favorable to plaintiffs, the CAB meeting falls within neither exception.

### 1. Discussion of public business

The first exception to VFOIA's definition of meeting appears in subpart (a) of the definition of meeting, which provides that "[n]either the gathering of employees of a public body" nor the "gathering or attendance of two or more members of a public body" shall be considered a "meeting" if "no part of the purpose of such gathering or attendance is the discussion or transaction of any public business, *and* such gathering or attendance was not called or prearranged with any purpose of discussing or transacting any business of the public body[.]" Code § 2.2-3701 (emphasis added). Accordingly, if the purpose of the CAB meeting was the discussion of public business *or* if the meeting were called or prearranged with the purpose of a discussion of public business of the Board, it does not fit within the exception. *See*

17

*Commonwealth v. Miller*, 273 Va. 540, 550 (2007) (recognizing the general rule that when statutory conditions are stated in the conjunctive each condition so stated must be met to satisfy the statutory requirement).

To appreciate the scope of the exception requires an understanding of the meaning of "public business" as the phrase is used in Code § 2.2-3701. Because VFOIA does not include a definition of the phrase "public business," we seek to apply its "plain and ordinary meaning" and are "guided by the context in which [the . . . phrase] is used." *Protestant Episcopal Church v. Truro Church*, 280 Va. 6, 21 (2010) (internal quotation marks and citations omitted). Given the requirement that all VFOIA exceptions be construed narrowly, Code § 2.2-3700, and VFOIA's heavy "interpretative thumb on the scale in favor of" open and transparent government, *Fitzgerald*, 289 Va. at 505, we must give the phrase "public business" a broad reading.[7]

Although we must interpret "public business" broadly, we agree with the defendants that the fact that a topic or topics generate significant public *interest* does not compel the conclusion that the topic or topics constitute public *business.* Of course, it often will be the case that topics of intense public interest also will represent topics of public business.

For a topic to constitute the "business" of a public body, it must relate to a subject that falls within the purview of that public body. Thus, a topic or topics may constitute "public

---

[7] Because VFOIA applies to government officials and bodies, the parties largely do not dispute the meaning of the modifier "public." It limits the scope of VFOIA's requirements to governmental matters as opposed to the purely personal or private affairs of the individuals who serve in government. This general agreement on the meaning of "public" does not extend to the meaning of "business" for the purpose of Code § 2.2-3701.

18

business" for one public body, such as a board of supervisors, but not constitute the "public business" of another, such as a county's industrial development authority.[8]

Furthermore, for a topic to constitute public business it must not just be something that conceptually could at some point come before a public body, but rather, the topic must be something that is either before the public body or is likely to come before the body in the foreseeable future. *Beck v. Shelton*, 267 Va. 482, 494 (2004). In *Beck*, we affirmed a circuit court's conclusion that a protest related to traffic controls at a particular street corner "was a citizen-organized 'informational forum' and that no part of the purpose of the gathering or attendance was the discussion or transaction of any public business" because "[t]he undisputed evidence at trial was that City Council *did not have any business pending before it on the issue of traffic controls, nor was it likely to have such matters come before it in the future*." *Id.* (emphasis added). Embracing this language and reasoning from *Beck*, today we make clear that a topic is "public business" for the purpose of Code § 2.2-3701 if it is either "pending before" the public body at the time or it is "likely to . . . come before it in the future." *Beck*, 267 Va. at 494.

Recognizing that such a definition of "public business" logically follows from a "literal reading" of the language we used in *Beck*, the defendants requested at oral argument in this Court that we revisit that language and conclude that, for a matter to constitute "public business," it must appear on the public body's formal agenda. (Oral Argument Recording at 27:28-27:58). To adopt the defendants' construction—that a topic cannot be public business until it appears on a formal Board agenda—would gut the open meeting provisions of VFOIA. It would allow portions of or full boards of supervisors to meet, discuss, and decide county business in secrecy

---

[8] Given that the Board possesses all "powers of the county as a body politic and corporate[,]" Code § 15.2-502(A), and is "the policy-determining body of the county[,]" Code § 15.2-504, all county business is Board business.

by waiting until after their private discussions and decisions to place an item on a formal agenda. Such a result cannot be reconciled with either the language or purpose of VFOIA, and we reject such a construction of the statute. Accordingly, "public business" in Code § 2.2-3701 means business that is on a public body's agenda or is likely to come before the public body in the foreseeable future.

Contrary to the repeated assertions of the dissent, such a definition of "public business" is neither new nor unprecedented. The language we utilize comes directly from our opinion in *Beck*. Although the dissent may disagree with our reading of the import of that language, because it is based on a quotation from a prior case, it simply is factually inaccurate to say this definition of "public business" is "new."

Furthermore, our reading of the language from *Beck* is neither strained nor idiosyncratic. Even the defendant Board members conceded at oral argument in this Court that the definition the dissent criticizes as unprecedented logically follows from a "literal reading" of the language from *Beck*. (Oral Argument Recording at 27:28-27:58). Although we are not bound by such a concession, it certainly suggests that there is nothing overly aggressive or idiosyncratic about our reading of the language.

Even absent the language from *Beck*, however, we think it clear under the express terms of VFOIA that the business of a local, legislative body encompasses the contemplation of topics that come before it or soon will. It matters not whether the topics are raised by a member of the body, another governmental employee, or a member of the community. As a deliberative body, part of the legislative body's business at every formal meeting is to hear from the community and

20

employees and consider those concerns.[9]  Thus, the *consideration* of topics that are on the

Board's agenda or soon will be *is* the business of the legislative body.

Our dissenting colleagues suggest that consideration is not enough and that some further

"action" or "activity" by a legislative body is necessary to transform the contemplation of issues

before it into "public business."  The dissent, however, does not suggest what that action or

activity might be.  Critically, VFOIA makes clear that the action or activity cannot involve

voting on the topic because the definition of meeting makes clear that "work sessions" of the

body and an "informal assemblage" of members of the body—neither of which would permit

votes on issues or any other formal Board action—are meetings under VFOIA and thus outside

the exception.  Code § 2.2-3701.  Lest there be any doubt that voting is not necessary for there to

have been a discussion of public business, the definition of meeting further provides that it

applies "whether or not votes are cast[.]"[10]  *Id.*  As to what action or activity beyond

---

[9] Certainly, such listening and consideration is "an activity engaged in" by local legislative bodies in the normal course and is considered a part of its usual "role" and "function." According to the definition relied upon by the dissent, slip op. at 33, n.1, and the dictionary upon which the dissent relies, *see* Webster's Third New International Dictionary 302 (1993), this meets the literal definition of "business."

[10] That VFOIA can apply to gatherings at which the public body does not engage in the "action" or "activity" of voting is well established and will come as no surprise to practitioners. For example, the *Handbook of Virginia Local Government Law* provides that "'[w]ork sessions,' 'retreats' and other informal gatherings of the public body at which public business is discussed are meetings covered by [VFOIA] just as certainly as more formal assemblies, *regardless of whether a formal agenda will be followed or votes taken*."  Roger C. Wiley, *The Freedom of Information and Government Data Collection and Dissemination Practices Acts*, in Handbook of Virginia Local Government Law § 23-2.02(c), at 23-8 (April Wimberley ed., 2023 ed.) (emphasis added) (citing Code §§ 2.2-3701, -3707; Ops. Va. Att'y Gen. 1981-82 at 442, 1977-78 at 484-85, 1974-75 at 579).

contemplation but less than voting the dissent contends is needed to transform the discussion and contemplation of the topic to public business, we are left to guess.[11]

Utilizing the proper definition of "public business" and viewing the evidence in the light most favorable to the plaintiffs, "part of the purpose[,]" Code § 2.2-3701, of the CAB meeting was the discussion of public business of the Board, and such public business was, in fact, discussed at that gathering.[12] It is undisputed that the purpose of the CAB meeting was to

_____

[11] Ultimately, the error in the dissent's overly crimped definition of the discussion of public business becomes clear when one recognizes what it would allow. Although disclaiming that its view would do so, the dissent's interpretation, carried to its logical conclusion, would allow a group of lobbyists, the heads of political parties, or groups of campaign contributors to hold a private meeting with a majority of a local legislative board. In that private meeting, the lobbyists, political officials, and donors could detail for the assembled board members their positions and expectations of the board regarding any and all topics that, while not yet on the board's agenda, are sure to appear on it in the next month. This would permit the interested parties to address all manner of *topics*, including the locality's budget, policing issues, tax rates, land use permits, and anything and everything else that properly could come before the board but had yet to appear on the agenda. So long as the board members took no action and engaged in no further activity at the private meeting, the dissent's construction of the statute would place the gathering beyond the reach of VFOIA. This cannot be so because such private meetings are exactly the type of back-room, secretive dealing that VFOIA was enacted to prevent. Such a result simply cannot be squared with VFOIA's admonitions that "affairs of government are not intended to be conducted in an atmosphere of secrecy since at all times the public is to be the beneficiary of any action taken at any level of government[,]" that VFOIA be "liberally construed to promote an increased awareness by all persons of governmental activities and afford every opportunity to citizens to witness the operations of government[,]" and that "[a]ny exemption from public access to records or meetings . . . be narrowly construed[.]" Code § 2.2-3700. To the contrary, the dissent's interpretation would allow the discussion of public business exception to swallow the rule.

[12] In advancing their argument that items must appear on a formal agenda for there to be a discussion of public business, defendants conceded at oral argument that if the 1:00 gathering had been (1) jointly called by the Citizen Advisory Board and the chief of police, (2) to provide for discussion of police use of force, property damage, riots, and use of chemical agents, and (3) that, during the 1:00 gathering, at least one Board member requested that the police include specific information in the after-action report, the gathering "could" be considered a "public meeting where public business was discussed" if the items previously had been placed on a formal Board agenda. In rejecting the "formal agenda" argument advanced by defendants, we note that, when the record is viewed in the light most favorable to plaintiffs, each of the circumstances detailed above existed relative to the CAB meeting.

22

discuss the events of May 30, 2020, and the police response to those events. Issues related to the riots, the use of force by police, the use of chemical agents to quell the riots, and the property damage that was caused were all discussed. One of the first responsibilities of any government is to protect the lives, safety, and property of its citizens. As such, it is hard to imagine any scenario in which the Board would not soon address a night of protest and unrest that eventually led to riots that caused significant safety concerns and property damage. Without question, the subsequent police response, an after-action report about that response, and how police should respond in the future were matters of public business that were all but certain to come before the Board.

After all, the county's response to the events and any steps it decided to take going forward are matters of county policy. As such, the ultimate decisions in these matters belonged to the Board as "the policy-determining body of the county[,]" Code § 15.2-504, possessing all "powers of the county as a body politic and corporate[.]" Code § 15.2-502(A). The information discussed would be part and parcel of any official county response, and the review of the performance of police officials falls within the Board's power and responsibility to "inquire into the official conduct of any office or officer under its control[.]" Code § 15.2-506. Such inquiry into the performance of the police during the events of May 30, 2020, is a necessary component of the Board's oversight of the department of law enforcement, which includes the power to hire and fire police officers or other county officials responsible for how the department carries out its function. *See* Code §§ 15.2-510, 15.2-512, 15.2-513, & 15.2-528. Certainly, a review of the events of that night and any policy changes by the county in response would have an effect on the police department's budget, which defendants acknowledged at trial is subject to Board "control." *See also* Code § 15.2-539.

23

Additionally, and again viewing the evidence in the light most favorable to the plaintiffs, there was evidence adduced to suggest not only that public business of the Board was discussed at the CAB meeting, but that business of the Board may have been transacted. According to Supervisor Franklin, Supervisor Boddye made a specific request of the police chief to include certain items in an after-action report. After making the request, Supervisor Boddye inquired of the police chief when the report would be available. Crediting Supervisor Franklin's testimony, coupled with the fact that a majority of the Board was present when Supervisor Boddye made the request, a reasonable factfinder could conclude that public business of the Board was not only discussed, but may have actually been transacted at the CAB meeting.

That the evidence properly viewed more than amply supports the conclusion that the 1:00 meeting was intended to and did involve the discussion of public business finds further support in the fact that the exact same topics were discussed at the properly noticed emergency Board meeting that occurred at 4:00 that very afternoon. Supervisors Bailey, Boddye, Angry, and Franklin each testified that the topics that were discussed at the 1:00 CAB meeting were discussed at the 4:00 Board meeting. Thus, evidence establishes not only that the topics discussed at the CAB meeting were likely to come before the Board in the future, but they actually came before the Board that very afternoon.[13]

Furthermore, although we reiterate our holding that topics being discussed need not be on a formal Board agenda to constitute a discussion of "public business," we note that the topics being discussed at the CAB meeting were on a formal Board agenda *while they were being*

---

[13] The defendants concede that the topics discussed were "public business" when discussed at the 4:00 meeting. Given this concession, absent the defendants' proposed "agenda" requirement, it is difficult to envision a scenario in which the discussion of the same topics at the CAB meeting do not constitute a discussion of public business of the Board.

*discussed in the CAB meeting.* At 1:24 p.m., while the CAB meeting was in progress, the county executive identified the agenda for the 4:00 Board meeting, informing Board members that "the topic of discussion will be, and can only be, the demonstrations that are occurring in PWC in response to the events in MN and what we can do to allow, and help ensure, the demonstrations occur safely and peacefully." Further, at 2:54 p.m., while the CAB meeting still was ongoing and the topics still were being discussed, the formal notice for the 4:00 Board meeting was issued and identified the meeting agenda as "[d]iscussion of the demonstrations occurring in Prince William County in response to events in Minnesota and what measures can be taken to ensure that demonstrations occur safely and peacefully." Thus, at least a portion of the discussion of the topics in the CAB meeting occurred *after* the topics had already been placed on a formal agenda for the Board.

From the evidence, a rational factfinder could conclude that the CAB meeting was called to discuss issues related to the riots and the police response to those riots and that such discussions occurred as planned. Thus, there was more than sufficient evidence to support the conclusion that the CAB meeting fell outside the first exception to the definition of a meeting in Code § 2.2-3701. Accordingly, the circuit court erred in granting the motion to strike on that basis.

### 2. Public forum

In criticizing the definition of "public business" described above, the dissent, on multiple occasions, uses some form of the phrases "informational gathering" or "informational meeting." Such references are notable in that not only do these phrases not appear in the text of the "public business" exception to the definition of meeting found in Code § 2.2-3701, they do not appear anywhere in VFOIA. The closest analog in VFOIA to either of these otherwise absent phrases is

25

found in the second exception to VFOIA's definition of meeting that appears in subpart (b) of the definition. That subpart provides that "[n]either the gathering of employees of a public body" nor the "gathering or attendance of two or more members of a public body" shall be considered a "meeting" if the gathering is

> at a *public forum*, candidate appearance, or debate, *the purpose of which is to inform the electorate* and not to transact public business or to hold discussions relating to the transaction of public business, even though the performance of the members individually or collectively in the conduct of public business may be a topic of discussion or debate at such public meeting[.]

Code § 2.2-3701 (emphasis added).

Defendants do not contend that the CAB meeting was a "candidate appearance" or a "debate[.]" Asserting the purpose of the gathering was to inform the electorate, they argue that every rational factfinder would be required to conclude that the CAB meeting falls within the "public forum" exception to the definition of meeting in Code § 2.2-3701.[14] We disagree.

The "public forum" exception to the definition of "meeting" in Code § 2.2-3701 is designed to further the laudable purposes of VFOIA, not inhibit them. The ultimate purpose of VFOIA is to require government transparency for the purpose of allowing an informed citizenry. *See* Code § 2.2-3700 ("This chapter shall not be construed to discourage the free discussion by government officials or employees of public matters with the citizens of the Commonwealth."). VFOIA is not intended to and does not prevent government officials, even in groups of three or more, from attending a gathering "the purpose of which is to inform the electorate[.]" Such

---

[14] Presumably, if the CAB meeting constitutes a "public forum . . . the purpose of which [wa]s to inform the electorate[,]" Code § 2.2-3701, it would fall within the meaning of the phrases "informational gathering" and "informational meeting" as those phrases are used by the dissent. Thus, the dissent's concerns in this regard would be more appropriate in a discussion of the subpart (b) exception rather than in a discussion of the meaning of "public business" in subpart (a).

forums permissibly may be convened by community groups, federal officials, or even government officials who are subject to VFOIA, such as members of a board of supervisors. A purely informational meeting, that does not involve "discussions relating to the transaction of public business," Code § 2.2-3701, does not constitute a meeting under VFOIA.[15]

As with all VFOIA exceptions to the general rule of open government, the "public forum" exception to the definition of meeting is a narrow one. Even a gathering whose motivating purpose "is to inform the electorate[,]" Code § 2.2-3701, falls outside of the exception if its purpose expands in such a way that allows for the "transact[ion of] public business or" for "discussions relating to the transaction of public business[.]" *Id.* Once that line is crossed, the gathering is a meeting under VFOIA and all of the open meeting requirements apply.

It can be difficult in the abstract to provide clear benchmarks for determining when a gathering has been called and held for the sole purpose of informing the electorate and when it has, either at its inception or over time, evolved to advance an impermissible purpose such as a discussion relating to the transaction of public business. Such determinations are inherently factual. Although some circumstances will be obvious, others will turn on fine factual distinctions involving what was said, by whom, and in what context. As a result, we are unable to provide bright lines to guide courts in making this determination—save one.

---

[15] The "public forum" exception does allow for a discussion of "the performance of" the subject officials "in the conduct of public business[.]" Code § 2.2-3701. That is, a discussion of the *past* performance of public business is permissible, but a discussion of a covered official's acts related to transactions of public business that may occur in the future is not. No evidence was adduced to suggest that the CAB meeting involved a discussion of defendants' past performance as members of the Board. Accordingly, this portion of the exception does not apply in this case.

That bright line is VFOIA's expressly stated presumption in favor of open government. Every provision of VFOIA, including the "public forum" exception in Code § 2.2-3701, "shall be liberally construed to promote an increased awareness by all persons of governmental activities and afford every opportunity to citizens to witness the operations of government" and "[a]ny exemption from public access to records or meetings shall be narrowly construed and no record shall be withheld or meeting closed to the public unless specifically made exempt pursuant to this chapter or other specific provision of law." Code § 2.2-3700(B). Accordingly, courts making this determination must "put[] the interpretative thumb on the scale in favor of" open government. *Fitzgerald*, 289 Va. at 505. Thus, in truly doubtful cases, the "public forum" exception does not apply, and the gathering is a meeting subject to Code § 2.2-3707.

Applying the statutory language and this standard to the instant case, the circuit court erred in granting the motion to strike. As noted above, the evidence adduced by plaintiffs provided more than a sufficient basis for a rational factfinder to conclude that the CAB meeting involved a discussion relating to the transaction of public business. Furthermore, crediting Supervisor Franklin's testimony, it went further than mere discussion, as a Board member made a specific request to the police chief regarding the police chief's performance of his duties and made further inquiry as to when those duties would be completed.

Viewing the evidence in the light most favorable to plaintiffs, the CAB meeting fell outside the second exception to the definition of a meeting in Code § 2.2-3701. Accordingly, the circuit court erred in granting the motion to strike.

### III. CONCLUSION

In enacting VFOIA, the General Assembly evinced a strong preference for open government. Absent proper invocation of a statutory exception, VFOIA requires "every meeting

28

. . . be open to the public" and that "[a]ll public records and meetings shall be presumed open[.]" Code § 2.2-3700(B). To ensure that this policy preference is respected, the General Assembly has instructed courts that VFOIA "shall be liberally construed to promote an increased awareness by all persons of governmental activities and afford every opportunity to citizens to witness the operations of government" and that "[a]ny exemption from public access to records or meetings shall be narrowly construed and no record shall be withheld or meeting closed to the public unless specifically made exempt pursuant to this chapter or other specific provision of law." *Id.* This instruction "puts the interpretative thumb on the scale in favor of" open government, *Fitzgerald*, 289 Va. at 505, and requires that courts resolving disputes under VFOIA favor open government in close cases.

Viewing the record in this case through such a lens and in the light most favorable to plaintiffs, we conclude that the evidence adduced at trial was sufficient to allow a rational factfinder to conclude that the CAB meeting was a meeting subject to the requirements of VFOIA. Thus, the circuit court erred in granting the motion to strike. Accordingly, we reverse the judgment of the circuit court and remand the matter for further proceedings consistent with this opinion.

*Reversed and remanded.*

CHIEF JUSTICE GOODWYN, with whom JUSTICE POWELL joins, dissenting, in part.

The definition of public business announced by the majority in its opinion, which asserts that certain topics are public business, is unsupported by the plain meaning of the phrase "public business," the context in which the phrase is used in the Virginia Freedom of Information Act (VFOIA), and this Court's precedent regarding what constitutes public business. This broadened definition of public business will make gatherings for the purpose of purely informational discussions between government officials and citizens subject to the notice requirements of VFOIA, despite language in VFOIA clearly intended to exempt such discussions from its requirements. Therefore, I dissent regarding the majority's new definition of "public business" and regarding the majority's analysis which incorporates that definition. "Public business" should be defined consistently with its plain meaning and the context in which it is used in VFOIA.

## I. BACKGROUND

A. Purpose of VFOIA

The General Assembly adopted VFOIA to "ensure[] the people of the Commonwealth ready access to public records in the custody of a public body or its officers and employees, and free entry to meetings of public bodies wherein the business of the people is being conducted." Code § 2.2-3700(B). Under VFOIA, "[t]he affairs of government are not intended to be conducted in an atmosphere of secrecy since at all times the public is to be the beneficiary of any action taken at any level of government." *Id.* The purpose of VFOIA is to provide citizens access to meetings where business is being conducted and actions are being taken or proposed by certain governmental bodies.

30

As an additional aspect of open government, VFOIA requires that it be construed to allow free discussion between government officials and citizens regarding matters of public interest. Such opportunities for information sharing are so important to open government in Virginia that interpreting VFOIA so as not to discourage such gatherings is specifically stated as a requirement of VFOIA. *See* Code § 2.2-3700 ("This chapter shall not be construed to discourage free discussion by government officials or employees of public matters with the citizens of the Commonwealth.").

Our Court has stated:

The public policy of the Commonwealth "ensures the people of the Commonwealth ready access to public records in the custody of a public body or its officers and employees, and free entry to meetings of public bodies wherein the business of the people is being conducted." Code § 2.2-3700(B). But FOIA "shall not be construed to discourage the free discussion by government officials or employees of public matters with the citizens of the Commonwealth." *Id.* Obviously, the balance between these values must be considered on a case-by-case basis according [to] the facts presented.

*Beck v. Shelton*, 267 Va. 482, 493 (2004).

B. Discussion of Public Matters

The VFOIA requirement, regarding encouragement of discussions of public matters, is effectuated through exceptions to the definition of the term "meeting" under VFOIA. The exceptions allow informational gatherings to be exempted from VFOIA meeting requirements. *See* Code § 2.2-3701. As noted by the majority, "[t]he first exception to VFOIA's definition of meeting appears in subpart (a) of the definition of 'meeting' (hereinafter 'subpart (a)'), which provides that '[n]either the gathering of employees of a public body' nor the 'gathering or attendance of two or more members of a public body' shall be considered a 'meeting' if 'no part of the purpose of such gathering or attendance is the discussion or transaction of any public business, *and* such gathering or attendance was not called or prearranged with any purpose of

31

discussing or transacting any business of the public body[.]' Code § 2.2-3701 (emphasis added)." Thus, a discussion of public matters between citizens and government officials or employees, which may be referred to as an "informational gathering," is not a "meeting" as defined by VFOIA and therefore is not subject to the notice and other requirements of VFOIA. However, if the discussion of public business is the purpose of the gathering, it becomes a meeting, and VFOIA applies.

The scope of the exception in subpart (a) is dependent upon the meaning of "public business" as the phrase is used in Code § 2.2-3701. The scope of exception (a) can be manipulated by changing the definition of public business from that intended by the General Assembly. VFOIA seeks to prevent deviation from the intended definition by its directive which states that "[t]his chapter shall not be construed to discourage free discussion by government officials or employees of public matters with the citizens of the Commonwealth. Code § 2.2-3700.

The majority's new definition of public business states that a *topic* is "public business" for purposes of Code § 2.2-3701 if it is either "pending before" the public body at the time or is "likely to . . . come before it in the future." (Slip Op. pp. 19-20). Any information discussed regarding any aspect of the topic by anyone is considered to be the discussion of public business, regardless of the involvement of members of the governing body in the discussion or the type of business pending regarding the topic. The new definition of what constitutes public business expressed by the majority is therefore unique and unprecedented in its extreme broadness.

By interpreting the definition of public business to include the discussion of any information concerning any aspect of a topic which is likely to come before the governing body, the majority eliminates the application of the subpart (a) exception to any gathering discussing

32

the demonstrations which occurred in Prince William County, regardless of what was actually discussed by anyone at the gathering or the purpose of the gathering. This is contrary to prior precedent.

## II. DEFINITION OF PUBLIC BUSINESS

A. <u>Plain Meaning and Context</u>

VFOIA does not include a definition for "public business." Because VFOIA does not include a definition of the phrase "public business," we seek to apply its "plain and ordinary meaning" and are "guided by the context in which [the . . . phrase] is used" in determining the General Assembly's intended meaning of the phrase. *Protestant Episcopal Church v. Truro Church*, 280 Va. 6, 21 (2010) (internal quotation marks and citations omitted).

"Public business" has long been a term of art used to describe the government's role or responsibility in carrying out its duties. Public business is activity undertaken or contemplated to be undertaken by a public entity; as the term is used in VFOIA, public business is *contemplated* and *conducted* by a public body on behalf of the people it represents.[1] It is not the information considered by the governmental body (the topic) that is the public business of the governing body, rather it is any activity contemplated or conducted by the governmental body that is the public business of the body and subject to the requirements of VFOIA. Stated differently, if a governing body has pending business before it on the topic of a demonstration which occurred in its county, the demonstration (the topic) is being discussed, but it is the action(s) the board contemplates or takes regarding the demonstration that constitutes the public business of the board. The demonstration is not the public business of the governmental body; it is a matter of

---

[1] "Business" is defined as "an activity engaged in as normal, logical, or inevitable and usu. extending over a considerable period of time: role, function." Webster's Third New International Dictionary 302 (1993).

33

public concern that all the citizens of the county have an interest in. Information concerning the demonstration should be allowed to be freely discussed and exchanged with the public, whereas contemplated public action of the board regarding the demonstration would be public business and discussion of that public business would be subject to the requirements of VFOIA.

The language of VFOIA underscores the distinction between matters of public interest and the conducting of the business of the people by a governing body. Consistent with that distinction, subparts (a) and (b) of the definition of meeting in VFOIA exempt informational gatherings—referred to in the VFOIA statute as "free discussions of public matters"—from the notice requirements of VFOIA. *See supra* at 32; Code §§ 2.2-3700 and 3701. Under subpart (a), such gatherings are subject to the requirements of VFOIA if any part of the *purpose* of the gathering is to discuss or transact contemplated public action of the governing body; VFOIA applies in such instances because the public should have access to meetings where business is being conducted or contemplated by the governmental body.

By defining "public business" as a topic, disconnected from the purpose for which the topic is being discussed or by whom, and the context in which it is being discussed, the majority's definition of "public business" sweeps too broadly in the context of Code § 2.2-3701. Expanding the scope of the definition of "public business" beyond its plain meaning to include practically all topics of public interest eliminates the subpart (a) exception for informational discussions between citizens and government officials regarding most public matters. It makes the inquiry regarding the purpose of the meeting, designed and previously used to distinguish discussions of public matters from discussions of public business of the governing body, irrelevant.

34

The majority's new definition is therefore an extremely significant change in the scope of VFOIA which will reduce the openness of government by discouraging the free exchange of information between government employees and citizens, through subjecting such gatherings, which would not be public business under the plain meaning of that term, to VFOIA notice requirements.[2]  *See* Code § 2.2-3700.  For example, under this new definition which makes a topic public business, a police briefing for victims to explain facts and answer questions concerning an ongoing crisis would be a violation of VFOIA, if three or more members of the governing board were present and no VFOIA notice had been sent, although the purpose of the gathering had nothing to do with the governing board exercising its deliberative authority.

Neither the plain meaning nor the context in which "public business" is used in VFOIA provide any authority for the majority's assertion that a "topic" of public interest constitutes "public business" for purposes of Code § 2.2-3701, merely because the topic may in some way be the subject of some business either "pending before" or "likely to . . . come before" the public body in the future.

B. Judicial Precedent

The majority's new definition of public business is contrary to prior decisions of this Court.  In our prior cases regarding the application of VFOIA to a gathering of citizens, the party or parties alleging a violation of VFOIA, as in this case, claimed that there was a discussion of public business at a gathering which took the purportedly offending gathering outside of the exemption which is now stated in subpart (a) of the definition of meeting.  *See Beck*, 267 Va. at

---

[2] The statute requires that public meetings be publicly noticed, Code § 2.2-3707(C)-(D), that any public body having a meeting provide the public with the agenda and related materials, Code § 2.2-3707(F), and that written minutes of the meeting be taken, Code § 2.2-3707(H), among other things.

486; *Nageotte v. Board of Supervisors*, 223 Va. 259, 268 (1982). In each case, the trial court, as in this case, appropriately did a factual inquiry regarding the purpose of the meeting to determine whether any part of the purpose of the gathering was the discussion of public business. *Beck*, 267 Va. at 493; *Nageotte*, 223 Va. at 269. In other words, the trial court judges realized that they were required to determine whether the gathering had been called and held for the purpose of acquiring or providing information or whether a purpose of the gathering was to discuss or transact public business, which would take the gathering outside of the VFOIA exception.

In *Nageotte*, the members of a Board of Supervisors attended a gathering to acquire information concerning a matter pending before the Board. The complainants asserted that the gathering violated VFOIA, but the Board claimed that the gathering was only for the purpose of acquiring information, that the Board did not arrange the gathering for the purpose of discussing or conducting business about the pending matter, and that the gathering was therefore exempt from the notice requirements of VFOIA. *Nageotte*, 223 Va. at 268. The trial court concluded that the purpose of the gathering was to obtain information regarding the matter pending before the Board and not for the Board to conduct business and that the gathering was therefore not a meeting subject to VFOIA.[3] On appeal, this Court upheld the trial court's determination. *Id.*

*Beck*, cited by the majority in its opinion, is a case in which approximately 20 residents concerned about the lack of a stop sign and other related traffic safety issues invited two city employees and three city council members to meet with them at an intersection to discuss the traffic issues. *Beck*, 267 Va. at 492-93. As recounted in the opinion, at trial the trial court judge found that the meeting was

---

[3] The statute involved in *Nageotte* was not Code § 2.2-3701 but a prior statute with similar language.

36

scheduled as a consequence of citizen inquiry; that the meeting's purpose, in essence, was an information forum in reference to traffic issues in a given neighborhood or on a specific street; that the three members of Council who appeared did not, according to the testimony which is uncontradicted, . . . discuss anything with each other as a group of three or otherwise.

*Id.* at 493.

It was not questioned that the traffic issues fell within the purview of the city council as the governing body of the city. However, the trial court ruled that the meeting was for informational purposes only and was not for the purposes of discussing public business. *Id.* On appeal, our Court noted that the evidence presented at trial and the competing requirements of VFOIA had to be considered on a case-by-case basis, in determining the purpose of the gathering, using the language in what is now subparts (a) and (b) of the definition of "meeting" as guidance.[4] *Id.* The Court concluded its discussion in that case by ruling that:

The trial court was not plainly wrong or without evidence to support its judgment that the Charlotte Street gathering was a citizen-organized "informational forum" and that no part of the purpose of the gathering or attendance was the discussion or transaction of any public business. The undisputed evidence at trial was that City Council did not have any business pending before it on the issue of traffic controls, nor was it likely to have such matters come before it in the future.

*Id.* at 493-94.

Realizing that determinations regarding the purpose of a gathering are inherently factual and depend on the circumstances and distinctions involving what was said, by whom and in what context, in both prior cases, as in this one, the trial court heard evidence concerning facts such as who arranged the gathering, whether information was sought or given, whether the matter was pending before the governing body, whether the members of the governing body who attended sat together, whether they discussed anything with each other as a group or otherwise, etc., to

---

[4] The statute considered in *Beck* was an earlier version of Code § 2.2-3701, but the relevant statutory language is the same as in the current version of Code § 2.2-3701.

determine whether discussion of public business was a purpose of the gathering. Such analysis would have been unnecessary under subpart (a) if the new definition of public business declared by the majority had been acknowledged and applied in those cases. It was not.

In the present case, the majority's assertion that "a topic is 'public business' . . . if it is either 'pending before' the public body at that time or likely to . . . come before it in the future," (Slip Op. p. 19), is contrary to this Court's ruling in *Nageotte* and finds little support in *Beck*. As the majority's only authority for its claim that a "topic," rather than the activity of a governmental body, constitutes public business, the majority asserts that it "embraces [the] language and reasoning from *Beck*," then quotes and italicizes a single-sentence factual recitation from the *Beck* opinion which states: "[t]he undisputed evidence at trial was that City Council *did not have any business pending before it on the issue of traffic controls, nor was it likely to have such matters come before it in the future*."

The quoted fact is not otherwise mentioned in the opinion's analysis. There is no stated reasoning concerning that sentence in the *Beck* opinion for the majority to embrace.[5] The extent of its relevance to the Court's ruling can only be speculated.

---

[5] Further, rather than providing support for the majority's proposition that a topic can be "public business," the language in *Beck* quoted by the majority demonstrates that this Court's prior use of the plain language meaning of "business" is different from the majority's new definition. Clearly, "business," as that term is used in the sentence quoted from *Beck*, refers to activity that was to be undertaken by the governmental body in carrying out its function as a public body. That reference to business is consistent with the plain meaning of "business" as used in *Nageotte* and in the context of VFOIA. Obviously, identification of a "topic"—without more—is not indicative of whether or what business was to be conducted.

The sentence quoted from *Beck* provides little, if any, authority for the assertion that a topic of interest which is the subject of public business becomes public business, as that term is used in Code § 2.2-3701, when it is the subject of the Board's consideration.

Although its mention in the opinion indicates that it was a factor relevant in determining whether the purpose of the gathering was the discussion of public business, there is no language in *Beck* asserting that the lack of pending business before the governmental body was the sole factor considered in the Court's decision regarding the purpose of the gathering. In fact, the Court's actual reasoning indicates that numerous factors needed to be considered in determining the purpose of the particular gathering. In its analysis, the *Beck* court stated that determination of the purpose of a gathering needed to be "considered on a case-by-case basis according [to] the facts presented." *Id.* at 493.

Business of a local legislative body includes the Board's contemplation and action upon any matter that comes before it; whether a vote is taken is irrelevant. It does not matter whether the issue it considers was raised by a member of the body, a citizen, an employee, or otherwise. The governmental body's business at its formal meetings is to hear and consider the issues presented to it. The consideration of issues that are on the Board's agenda, or raised from the floor at the meeting or come before the body in some other way, are the business of the governing body. The topic of the issue considered is not.[6]

---

[6] The majority believes that giving the words chosen by the General Assembly their usual and plain meaning "crimps" the statute and that applying the exemption in subpart (a) consistently with its plain language would allow private meetings that "would permit the interested parties to address all manner of topics, including the locality's budget, policing issues, tax rates, land use permits, and anything and everything else that properly could come before the board but had yet to appear on the agenda." (Slip. Op. p.22, n.10). It would not.

Those are exactly the types of gatherings that the General Assembly made subject to VFOIA, through the plain language it drafted. The majority's "uncrimping" of the General Assembly's legislation by its strained interpretation of public business is unnecessary.

To the extent the purpose of the discussion or gathering concerns Board action, pending or prospective, on any issue, it is a discussion of public business of the Board and subject to VFOIA. Likewise, private meetings prearranged for the purpose of discussing activity to be undertaken by the Board are subject to VFOIA requirements pursuant to the plain meaning of VFOIA's terms, no matter the topic. There is no logical or other support for the majority's claim

39

There is no precedent from this Court which supports the assertion that "a topic is 'public business' if it is either 'pending before' the public body or it is 'likely to . . . come before it in the future.'" Numerous other jurisdictions which have considered similar propositions have rejected them. *See In re Kansas City Star Co.*, 73 F.3d 191, 195 (8th Cir. 1996) (interpreting Missouri's open meeting law in deciding, as matter of law, that merely providing information or receiving viewpoints is not discussing public business); Cal. Gov't Code § 54952.2(c)(2) (exempting gatherings open to the public involving a discussion of a matter of public interest so long as the board members do not discuss business amongst themselves); *Board of Cnty. Comm'rs v. Costilla Cnty. Conservancy Dist.*, 88 P.3d 1188, 1193 (Colo. 2004) (noting that broadening the concept of public business to encompass all matters of public concern would lead to absurd results by requiring notice be given anytime "members attend meetings on any public issue"); *Kansas City Star Co. v. Fulson*, 859 S.W.2d 934, 940 (Mo. Ct. App. 1933) ("Matters of public business are not synonymous with matters of public interest."); *White v. King*, 60 N.E.3d 1234, 1239 (Ohio 2016) (defining "public business" as activity undertaken "within the purview of [a public body's] duties, functions and jurisdiction"); *Wood v. Battle Ground Sch. Dist.*, 27 P.3d 1208, 1217 (Wash. Ct. App. 2001) ("[P]articipants must collectively intend to meet to transact the governing body's official business.").

---

that "as long as board members took no action and engaged in no further activity in the private meeting the gathering would be beyond the reach of VFOIA." *Id.*

The concept that business has to appear on the agenda of the governing body or be likely to appear on the agenda to be public business is not stated in VFOIA and is a concept derived from the majority's interpretation of *Beck*, which, as noted in this dissent, would appear to be inconsistent with the plain language of VFOIA regarding the meaning of "public business" expressed in the statute and prior opinions of this Court. *See Nageotte*, 223 Va. at 268; *Beck*, 267 Va. at 493-94. (Slip Op. pp. 36-38).

To be clear, the proposition that is disputed, and not recognized by our Court in *Beck* or by the defendants, is the proposition that a topic can constitute the public business of a governing body, as the term "public business" is used in VFOIA.[7] The language in *Beck* does not state what constitutes public business, but the Court's use of the term "business" in *Nageotte* and in *Beck* indicates that public business is not the topic discussed but rather the action or prospective action contemplated, considered, or undertaken by the governmental body. The relevance of the distinction is that the majority's new definition of public business, by stating that topics are public business, includes practically all information concerning issues of public interest within the definition of public business. That broad definition of public business will short-circuit any inquiry regarding the purpose or circumstances of a gathering and undermine the exemption in subpart (a) by making any informational discussions, no matter the purpose, situation, or circumstances, discussions of public business subject to the restrictions of VFOIA.

C. VFOIA

The majority, in its interpretation of the meaning of public business, as the term is used in VFOIA, has failed to consider VFOIA's "special rule of construction"[8] stating that VFOIA

---

[7] The majority claims that "the defendant Board members conceded at oral argument in this Court that the definition the dissent criticizes as unprecedented logically follows from a 'literal reading' of the language from *Beck*." (Slip. Op. p. 20). The record does not support that assertion. The unprecedented definition which is being criticized in this dissent is the assertion that certain topics constitute public business. The response perceived and cited by the majority as a concession (to the majority's assertion that a topic can be public business regardless of the context in which it is discussed or by whom) was in response to a question regarding whether business that was likely to be on the agenda in the future could be public business, and the defendants replied: "That is a literal reading of *Beck* and I urge the Court to look at that case and that context when evaluating this case because that was a very different . . . that was a very different set of circumstances there." That statement by defendant Board members is not a concession that a general topic can be considered to be public business.

[8] The majority refers to the other directives stated in the same paragraph of VFOIA as "special rules of construction for interpreting VFOIA," adopted by the General Assembly "to help effectuate [the] purposes" of VFOIA.

"shall not be construed to discourage the free discussion by government officials or employees of public matters with the citizens of the Commonwealth," Code § 2.2-3700, and the heavy thumb such directive should have placed on the scales against the interpretation the majority settled upon. (*See* Slip Op. p.15.) As a result, the majority, contrary to the plain language of VFOIA and court precedent, construes VFOIA in a manner that discourages the free discussion of information between government officials and citizens, in direct conflict with language in VFOIA. *See* Code § 2.2-3700; *Beck*, 268 Va. at 493.

The new definition of public business subjects informational gatherings, previously exempted by subpart (a), to the requirements of VFOIA, and eliminates consideration of the purpose of the gathering inquiry embedded in subpart (a), which is used to distinguish public matters from public business, for purposes of VFOIA coverage.

Subpart (a) was included in the statute to make sure that certain informational meetings between citizens and government officials were not curtailed by VFOIA. However, under the majority's new definition, a purely and undeniably informational gathering between police and citizens, concerning the facts surrounding a crime and the police response to it, attended by board members, would be found to violate VFOIA, if the topic of the crime was pending or likely to be on the agenda at a future board meeting, even though the purpose of the gathering had nothing to do with the Board taking any action regarding the matter. That is contrary to how VFOIA was designed to operate pursuant to the plain language used by the General Assembly in drafting the statute. The new definition discourages citizen-organized informational gatherings by requiring the application of VFOIA notice requirements, even if the purpose of the meeting is purely informational.

42

Thus, the new definition construes VFOIA in a manner which is in clear defiance to a VFOIA directive to the contrary. The majority repeats the mantra that exceptions to VFOIA are to be construed narrowly and that VFOIA requires a heavy "interpretive thumb" on the scale in favor of open and transparent government as justification for its novel and broad definition of public business. However, neither the narrow construction of exceptions, nor the supposed "heavy thumb," is sufficient to supplant first principles of statutory construction and interpretation. The mantra is not a talisman which allows the Court to ignore the plain language and the context of the words used by the General Assembly in VFOIA, nor is it justification for a strained interpretation of the plain language of a statute in a manner which will eliminate an exception that the General Assembly, in its wisdom, has included for the purpose of improving the openness of government.

Although, inexplicably not considered by the majority in its analysis, the General Assembly's directive that the VFOIA "not be construed to discourage the free discussion . . . of public matters by government officials and employees with the citizens of the Commonwealth," ("the third directive") stands on equal footing with, and is not subordinate to, the directive that exceptions are to be construed narrowly, which the majority refers to in isolation and often. The two directives are in consecutive sentences of the same paragraph, and they must both be considered when they are relevant to interpreting the language of VFOIA.[9]

### III. CONCLUSION

The definition of public business announced by the majority asserts that certain topics of public interest are public business. Considering a topic to be the public business of a

---

[9] The third directive appears to be a guardrail put in place by the General Assembly to protect the subparts (a) and (b) exceptions to the definition of meetings.

governmental body is contrary to the plain meaning and context in which the term "public business" is used in VFOIA. It is also inconsistent with and unsupported by prior precedent of this Court, and contrary to a special rule of construction required by the General Assembly. By broadening the definition of public business to include topics which are likely to be the subject of some unidentified public business, the majority unnecessarily narrows the application of the subpart (a) exception and creates VFOIA violations in situations where none would exist if the plain language definition of public business were applied.

Thus, I respectfully dissent to the majority's definition of public business and its application and analysis associated with that definition.